ESTATE OF EDWIN WALLACE NEFF, DECEASED, STANLEY L. HAHN, SPECIAL ADMINISTRATOR AND EXECUTOR, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent; ESTATE OF MARION FRANCES CLOW, DECEASED, CHRISTOPHER B. CLOW, EXECUTOR, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Estate of Neff v. Commissioner
Docket Nos. 11437-86; 32585-86.
United States Tax Court
T.C. Memo 1989-278; 1989 Tax Ct. Memo LEXIS 278; 57 T.C.M. (CCH) 669; T.C.M. (RIA) 89278; June 8, 1989. Francis J. Higgins, Alan R. Brodie, Thomas F. Joyce, and Rollin C. Huggins, Jr., for the petitioners. James S. Stanis and Mark Humphrey, for the respondent. GERBER
MEMORANDUM FINDINGS OF FACT AND OPINION GERBER, Judge: In these consolidated cases, respondent determined deficiencies in the estate tax of Edwin Wallace Neff of $ 251,834.04 and in the estate tax of Marion F. Clow of $ 944,687.57. The only issues for our consideration are the values of Rand McNally & Company (Rand McNally) common stock owned by the decedents at their respective deaths. FINDINGS OF FACT Edwin Wallace Neff (Neff or decedent) died a resident of Los Angeles, California, on June 8, 1982. Stanley L. Hahn is the duly qualified and acting special administrator and executor of the Estate of Edwin Wallace Neff, deceased. Marion Frances Clow (Clow or decedent) died a resident of Lake Forest, Illinois, on September 21, 1982. Christopher B. Clow is the duly qualified and acting executor of the Estate of Marion Frances Clow, deceased. The stipulation of facts and attached exhibits are incorporated *280 herein by this reference. [1]
At the date of Neff's death, the Wallace Neff Trust owned 25,960 shares of Rand McNally common stock, whose value decedent was required to report on his Federal Estate Tax return as a transfer during decedent's life. See section 2035. [2] The Wallace Neff Trust was established in accordance with a Family Settlement Agreement dated December 6, 1979. At the date of Clow's death, he owned 118,314 shares of Rand McNally common stock. Rand McNally was founded in 1856 by William Rand, who was later joined by Andrew McNally. Initially, the company printed a variety of materials including annual reports, tickets, books, and railroad timetables and guides. Rand McNally printed its first map, of a railroad route, in 1872. In 1899, Rand sold his interest in the company to McNally. As the automobile became *281 popular, Rand McNally began to develop road guides and maps. Through its efforts to develop road and highway maps, the company pioneered the nation's numbered highway system. By 1922, the company was publishing road maps of all the states, and in 1924 it first introduced the "Rand McNally Road Atlas." After World War II, Rand McNally expanded its business through acquisitions. In 1948, the company purchased W. B. Conkey Company, a book manufacturing firm, a move that established Rand McNally in the book manufacturing business. The company also bought a variety of book publishing companies as well as technologically innovative firms, such as Financial Data Services Company, a computerized printer of installment payment coupon books, and Transportation Data Management (TDM), an information services company serving the transportation industry. As a result of restructuring, in 1980 Rand McNally sold its textbook division to Houghton Mifflin and disposed of an antiquated book manufacturing plant in Hammond, Indiana. In 1982, the company was executing an early retirement plan with the intention of forming a leaner management group. In 1982, Rand McNally was organized into four operating *282 entities, with a fifth entity providing corporate support functions. (1) The Publishing Group consisted of: (a) the Trade Division, which created and published books, travel guides, maps, atlases and globes; (b) the Map Division, which created street and highway maps, developed premium products and operated three retail stores; and (c) the International Division, which translated and published foreign books and maps. Publishing Group revenues were just over 31 percent of total company revenues in 1981. (2) The Systems Group consisted of: (a) the Ticket Division, which produced and printed tickets; (b) the Bank Publications Division, which compiled and published banking industry directories and guides; and (c) the Financial Systems Division, which produced payment coupon books and other products. The Systems Group contributed just over 17 percent of the company's revenues in 1981. The ticket business, which was mildly affected by economic cycles, was very good in 1982. The bank and financial products were considered basic materials in the credit business, so that demand for these products remained steady. (3) The Book Manufacturing Group marketed the printing, binding and production *283 capabilities of the company to other publishers. The Book Manufacturing Group was the largest of all the company's operating groups, contributing 50 percent of total firm revenues in 1981. The company made many book manufacturing innovations that enhanced its reputation as a quality book maker. In 1982, the company was improving its Kentucky plant for the initial production of Encyclopedia Britannica volumes, having won an 8-year contract for producing the encyclopedias away from R. R. Donnelley. In 1982, the book manufacturing industry had overcapacity, resulting in price cutting. The industry also faced foreign competition. Increases in the cost of high quality paper, which accounted for 50 to 75 percent of job costs, resulted in lower profit margins. (4) The fourth operating entity, Rand McNally-TDM, was an 80-percent owned subsidiary that compiled route and tariff information for the transportation industry. In 1981, this group contributed approximately 1 percent of the company's revenues. The services provided by this group capitalized on Rand McNally's expertise in mapping and transportation. However, the Motor Carrier Act of 1980, legislation that deregulated interstate *284 trucking, quickly made this business obsolete. The printing industry is capital intensive. Rand McNally also had substantial additional capital needs during the period at issue connected with the Encyclopedia Britannica contract. Rand McNally was a privately held company. Its stock was not listed on any exchange. Rand McNally had outstanding on the following dates the following numbers of shares of common stock: January 1, 1982
1,565,162
June 8, 1982
1,167,418
December 31, 1982
1,167,140
The decline in the number of shares resulted principally from two extraordinary transactions that occurred during the first half of 1982. Prior to 1982, a large percentage of the Rand McNally common stock was held by a trust for the benefit of family members. That trust was to be dissolved and the stock distributed in early 1982. In 1981, Rand McNally management consulted the Company's investment banker, Morgan Stanley & Co., concerning a program to repurchase shares. There were three reasons behind the anticipated repurchase. In the early 1970's, Frederick McNally, a grandson of one of the founders, was fired from the company and relations with him *285 were strained. His shares, like other family members' shares, would be released from the trust in 1982 and he wished to sell them. In addition, other trust beneficiaries also wanted liquidity for their shares. Finally, the company wanted to reduce the number of shareholders to avoid the reporting obligations under the Securities Exchange Act of 1934. At the end of 1981, the corporation had approximately 375 shareholders. Rand McNally was in a good position to effect the proposed repurchase. The 1980 sale to Houghton Mifflin of its textbook division, along with the tax benefit of the donated Hammond, Indiana, plant, had netted at least $ 5 million. As of December 31, 1981, Rand McNally had cash or cash equivalents of approximately $ 17 million plus a note from Houghton Mifflin for approximately $ 5 million. Rand McNally and Frederick McNally agreed upon a price of $ 32 per share for Frederick's 75,828.5 shares. Those shares were repurchased in January 1982 for $ 2,426,512. On April 7, 1982, Rand McNally made an offer to all its shareholders to purchase or exchange up to 392,222 shares of its common stock. Up to 236,672 shares could be purchased for cash at $ 32 per share, *286 and up to 156,250 shares could each be exchanged for one share of preferred stock. The preferred would pay an annual $ 5.28 cumulative dividend, and could be voluntarily redeemed at $ 32 per share commencing on June 15, 1985. Commencing June 15, 1988, and ending June 15, 1992, 20 percent per year of the preferred would be mandatorily retired at $ 32 per share. There was no trading market for the preferred stock. A letter accompanying the offer of repurchase stated: The Board of Directors believes the terms of the repurchase offer are fair and reasonable from a financial point of view both to the stockholders who elect to tender their shares for cash or preferred stock and to the stockholders who elect to retain their common stock. The repurchase offer expired on May 7, 1982, and was not renewed. As a result of the repurchase offer, the following number of shares were tendered by shareholders and purchased by Rand McNally: $ 32 Per Share Cash
236,157.5
$ 7,557,040
Preferred Stock
85,758  --
321,915.5
$ 7,557,040
In July 1982, Rand McNally purchased 278 shares of common stock at $ 32 per share from Chandler Everett. Mr. Everett *287 did not participate in the earlier repurchase offer because he had inadvertently misplaced his stock certificate. For the years 1977 through 1981, Rand McNally reported the following sales, margins, and earnings figures and ratios: 1981
1980
1979
1978
1977
Revenues (000's)
$ 153,648
$ 153,192
$ 157,199
$ 144,206
$ 129,146
Gross margin [3]
22.8%
26.5%
26.5%
28.4%
29.8%
Operating
3.2%
4.8%
6.3%
7.7%
8.7%
margin [4]
EBIT/share [5]
$ 3.15 $ 4.70 $ 6.36 $ 7.10 $ 7.12 Net income (000's)
$ 5,538 $ 7,989 $ 4,924 $5,241 $ 4,959 Net margin
3.6%
5.2%
3.1%
3.6%
3.8%
Earnings per share
$ 3.54 $5.09 $ 3.12 $ 3.32  $3.14 (EPS)
Current ratio
2.4  2.4 2.9  3.2  3.0  Return on avg.
9.8%
15.5%
10.5%
12.1%
12.5%
common equity
(ROE)
Rand McNally had the following income for the trailing 12-month periods ending March 30, 1982, and June 30, 1982: *288 [6]
March 31, 1982
June 30, 1982
Revenues
Net Sales
$ 156,322
$ 156,296
Royalties
790
888
Total Revenues
157,112
157,184
Cost of Sales
120,011
120,623
Gross Margin
37,101
23.6%
36,561
23.3%
Operating Expenses
32,032
32,872
Operating Margin
5,069
3.2%
3,689
2.3%
EBIT/share
$ 3.24
$2.46
Interest Income
4,167
3,624
Interest Expense
2,193
2,151
Income before income taxes
7,043
4.5%
5,162
3.3%
Income taxes
1,808
1,132
Net income
5,235
3.3%
4,030
2.6%
Net income per share
$ 3.34
$ 2.69
The book value per common share of Rand McNally stock on March 31, 1982, was $ 38.84. The book value per common share of Rand McNally stock on June 30, 1982, was $ 40.95. Rand McNally had trailing 12-month *289 earnings per share for the period ending September 30, 1982, of $ 2.90, and expected earnings per share for fiscal year 1983 was $ 3.47. Rand McNally paid an annual dividend equal to $ 1.25 per share on its common stock. Rand McNally's balance sheet on June 30, 1982, after the repurchase, is attached as Appendix A. There were a number of companies whose shares were publicly traded that were in businesses similar to Rand McNally, specifically the printing and publishing business. They traded at the following prices and price/earnings (P/E) ratios at the dates of decedents' deaths: Primary
June 8, 1982
September 21, 1982
Company
Market
Price
P/E
Price
P/E
Courier
OTC $  7.25
12.1
$  7.25
16.9
Commerce Clearing House
OTC 53.00
14.5
57.25
15.3
John H. Harland
NYSE
21.25
12.1
27.88
15.1
Int'l Banknote
ASE 4.75
9.7
4.13
12.1
MacMillan
NYSE
12.50
9.7
16.38
11.0
Prentice-Hall
ASE 27.63
8.1
30.50
8.9
W. A. Krueger
OTC 10.75
5.3
15.25
7.0
Harper & Row
NYSE
8.13
5.0
9.13
6.5
Webb
OTC 12.75
5.2
9.75
5.9
Lehigh Press
ASE 18.00
4.4
17.50
4.6
*290 In addition, there are a number of other comparable companies, for which the information in the record is less detailed: June 1982
September 1982
Company
Price
P/E
Price
P/E
De Luxe Check Printers
$ 25.63
10.8
$ 29.75
11.9
John Blair
33.75
8.1
40.00
9.4
SFN
17.63
7.3
27.38
10.6
Houghton Mifflin
23.63
6.5
25.75
8.7
Bowne
10.00
6.0
14.63
10.2
Harcourt Brace Jovanovich
13.63
5.4
17.88
8.2
These companies had the following comparative financial data for the periods indicated (names abbreviated): Courier
CCH
Harland
Banknote
P-H
Krueger
Sales
140
313
143
228
391
203
(000,000's)
EPS
0.72
3.20
1.68
0.60
3.41
2.16
Sales Growth (1977 = 100)
1981
141
194
222
264
169
207
1980
138
158
176
254
153
179
1979
128
131
145
164
122
134
Pretax Margins
1981
.1%
18.0%
17.9%
7.0%
15.6%
7.2%
1980
4.6
17.6
18.0
2.1
16.1
7.7
1979
5.4
18.6
17.8
5.6
18.2
10.1
Return on Average Common Equity (ROE)
1981
3.6%
55.3%
24.1%
22.4%
20.2%
19.6%
1980
11.4
63.0
23.2
3.9
20.4
20.9
1979
12.5
57.9
22.4
18.1
20.3
22.8
Current Ratio
2.4
3.8
3.3
1.5
1.5
2.5
Market/Book [7]
37%
675%
303%
161%
166%
108%
Ratio (Avg.) [7]
Dividend
1.4%
2.8%
2.5%
1.8%
5.7%
5.7%
Yield (Avg.) [8]
*291 H & R
Webb
Lehigh
Mac
HBJ
De Luxe
Sales
170
135
94
430
539
504
(000,000's)
EPS
1.89
2.43
4.22
1.17
2.70
2.33
Sales Growth (1977 = 100)
1981
183
174
180
84
145
186
1980
179
158
145
110
136
158
1979
147
144
148
103
123
135
Pretax Margins
1981
7.0%
6.3%
3.5%
7.4%
7.4%
20.5%
1980
5.8
6.9
7.5
4.0
8.9
19.6
1979
4.9
7.2
7.3
5.3
10.0
19.8
Return on Average Common Equity (ROE)
1981
9.5%
15.6%
15.7%
8.0
14.3%
26.6%
1980
7.6
15.8
19.7
4.8
16.0
26.2
1979
6.1
16.3
21.3
6.9
17.8
26.6
Current Ratio
2.1
2.0
2.4
2.5
2.4
2.2
Market/Bookn7
42%
70%
59%
98%
86%
280%
Ratio (Avg.)
Dividend
9.3%
5.9%
0%
4.3%
6.5%
3.8%
Yield (Avg.) [8]
HM
Blair
SFN
Bowne
Rand McNally
Sales
186
265
271
120
154
(000,000's)
EPS
3.55
3.65
3.09
1.82
3.54
Sales Growth (1977 = 100)
1981
149
187
153
204
119
1980
132
155
144
177
119
1979
127
139
127
134
122
Pretax Margins
1981
9.3%
10.0%
25.4%
28.1%
4.7%
1980
10.9
10.1
23.9
25.8
7.5
1979
16.6
11.9
23.9
20.8
5.0
Return on Average Common Equity (ROE)
1981
13.0%
19.2%
21.8%
29.6
9.8%
1980
13.0
18.8
22.7
30.0
15.5%
1979
20.2
22.7
23.5
25.0
10.5%
Current Ratio
2.5
2.0
3.5
4.4
2.4
Market/Bookn7
94%
175%
150%
165%
N/A
Ratio (Avg.)
Dividend
6.5%
2.7%
5.2%
3.0%
N/A
Yield (Avg.) [8]
*292 During the period from November 1978 to July 1981, there were 40 transactions involving Rand McNally stock. Almost half were repurchases by the company, the remainder were private transactions, often involving company management. The company repurchases often involved employees. The price for these transactions ranged from $ 22.50 to $ 33.00 per share, and the average was $ 26.67. The most recent price per share was $ 28. The total number of shares in these transactions was 16,291, and the average per each transaction was 407. The median number of shares per transaction was 200. The largest transaction involved 4,500 shares, while the smallest involved six shares. This small volume of shares does not establish or is not indicative of a public market. The representatives of decedents' estates reported the value of the Rand McNally stock on decedents' respective estate tax returns *293 as $ 18 per share. Respondent, in the statutory notices of deficiency, determined that the Neff and Clow shares were worth $ 32 and $ 30, respectively, on the respective valuation dates. Experts
James R. Cerone, one of petitioners' experts, concluded that the stock was worth $ 15 per share on June 8, 1982, and $ 14 per share on September 21, 1982. Utilizing a comparable company analysis, he concluded that Rand McNally was in poor condition relative to companies in the same or similar businesses. Also, as part of his valuation procedure, he adjusted the latest earnings by taking out the interest earned on the Houghton Mifflin notes, since this income was no longer available after the stock repurchase. He concluded that the Rand McNally common equity was worth $ 25 million and $ 23 million on June 8 and September 21, 1982, respectively, implying respective 8.0 and 10.0 P/E ratios on Rand McNally's adjusted earnings. This equals $ 21.41 and $ 20 per share for the Neff and Clow shares, respectively. Finally, he applied a 30-percent discount to these figures to account for their lack of marketability, resulting in the $ 15 and $ 14 valuations. Jeffrey Pettit also testified *294 on behalf of petitioners. He concluded that the Clow shares were worth $ 18 on September 21, 1982, using a comparative company analysis. Without a discount for lack of liquidity, Pettit valued the Clow shares at $ 20 per share, reflecting a P/E ratio of 6.9 on September 30, 1982, trailing 12-month earnings per share of $ 2.90. Pettit utilized a 10-percent discount for lack of liquidity, recognizing the past purchases of the common shares on the part of the company and others, thus arriving at the $ 18 figure. Pettit advised Rand McNally in connection with the 1982 repurchase offer. Ellis Evans testified on behalf of respondent. Evans, in his original report, concluded that the company would be the primary purchaser of the estate's holdings, and concluded that the Neff and Clow shares were worth $ 32 and $ 30 per share, respectively. In a supplement to his report, using a comparative company analysis, he concluded that the Clow shares were worth $ 27 per share, based on 62 percent of $ 40.46 net asset value per share. In a similar manner, he concluded that the Neff shares were worth $ 25 per share. Eugene Lerner and Nathan Miller were respondent's other experts. They used *295 a weighted average of a comparable company approach, discounted cash flow approach and market price approach to value the subject shares. They concluded that the Neff and Clow shares were worth $ 33.28 and $ 37.53 per share, respectively. Because the Clow shares constituted more than 10 percent of the total outstanding, Lerner and Miller did not discount the shares for lack of marketability. Lerner and Miller applied a 20-percent discount for lack of marketability to the Neff shares. They concluded that the Neff and Clow shares were worth $ 26.63 and $ 37.53, respectively, on the valuation dates. OPINION A decedent's gross estate includes the value at the time of his death of all property in which he had an interest. Secs. 2031(a) and 2033. The value of property includable in the decedent's gross estate is its fair market value. Fair market value is the price at which property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts. Sec. 20.2031-1(b), Estate Tax Regs.; *296 United States v. Cartwright,411 U.S. 546, 551 (1973); Estate of Hall v. Commissioner,92 T.C. 312 (1989). The issue for our consideration is the valuation of the Rand McNally stock owned by decedents at the time of their deaths. Respondent argues that $ 32 is the fair market value of the shares, essentially referencing the price of the stock repurchase offer. He also posits that, at the least, $ 32 should be the starting or base point from which we determine the value. Petitioners argue that the offer had already expired, limiting the relevance of the $ 32 figure, and that the $ 32 price included a substantial premium to ensure the goal of the repurchase (reducing the number of shareholders) was met. Petitioners also argue that respondent's position assumes that Rand McNally was the willing purchaser, precluded by analogy to Estate of Andrews v. Commissioner,79 T.C. 938 (1982) (Willing purchaser is not assumed to be a member of buyer's family.). See Propstra v. United States,680 F.2d 1248 (9th Cir. 1982); *297 Estate of Bright v. United States,658 F.2d 999 (5th Cir. 1981); and Minahan v. Commissioner,88 T.C. 492 (1987). We find that the fair market value of the Neff shares is $ 21 per share, and the value of the Clow shares is $ 20 per share. The fact that the offer had already expired is one factor in discounting the relevance of the $ 32 figure. This case is not like those where a binding purchase agreement setting a price is in effect. See United States v. Land,303 F.2d 170 (5th Cir. 1962), cert. denied 371 U.S. 862 (1962); Brodrick v. Gore,224 F.2d 892 (10th Cir. 1955). In addition, because the blocks of shares at issue were relatively large, Rand McNally would not be financially able to repurchase those blocks, given the capital intensive nature of the business. (However, the repurchase history will be quite relevant to the discount for lack of liquidity.) The most persuasive evidence that $ 32 was not the fair market value is a comparison with comparable companies below. Actual arm's-length sales of unlisted stock within a reasonable time before or after the valuation date are the best criteria *298 of market value. Estate of Andrews v. Commissioner, supra at 940. In the absence of arm's-length sales, the value of closely held stock should be based upon the value of listed stock of other corporations engaged in the same or similar line of business. Sec. 2031(b). The shares of those comparable companies trade at prices equal to multiples of their most recent earnings per share -- the P/E ratio. In general, the P/E ratio is a common indicator of performance -- how much investors are willing to pay for a dollar of earnings. By comparing Rand McNally's performance in sales, margins, liquidity and other measures to the comparable companies, we can determine a suitable range for Rand McNally's P/E ratio. The relationship between market price, most recent earnings, and the P/E ratio enables us to select a suitable market price for the Rand McNally (or any) stock. Another measure of comparison is the relationship between the market value of a share of common stock and the book value of that same share. The market/book ratio indicates how well the investment community feels the firm is making use of its assets. The P/E ratio and market/book ratio are common measures *299 of a firm's performance, and may be used as barometers of fair market value. As previously indicated, the first step in our comparable company valuation is comparison with other companies. With the assistance of the experts, we have chosen four broad categories for comparison. The comparable companies are similar to Rand McNally in terms of type of business and sales volume. Petitioners' and respondent's experts chose many of the same companies. Balance sheet. For the periods at issue, Rand McNally had a relatively strong balance sheet. Its 2.4 to 2.6 current ratio was about median for the comparable companies. Its cash position was stronger than it had ever been, historically, even after the stock buyback and considering the preferred dividend. Debt made up less than half of the total capitalization. In addition, long-term debt as a proportion of total invested capital, 27 percent, ranked favorably with the other comparable companies. Sales Growth. Over the 5-year period, the sales of many of the comparables approximately doubled. Rand McNally's sales grew at a much slower pace, approximately 20 percent over 5 years. However, the figures were not adjusted to *300 account for the sale of the textbook division in 1981. This would, and did, have a negative impact on sales growth. In fact, when adjusted, the company experienced growth in sales of 13 percent for 1981, placing Rand McNally solidly in the middle of the comparable companies. In addition, sales would ostensibly be favorably affected by the Encyclopedia Britannica contract, as soon as production began. This is not reflected in the figures. Pretax margins. Reflecting the differing mix of businesses, and the different margins of each, it is difficult to compare pretax margins, at least in absolute terms. However, in a relative sense, it appears that Rand McNally suffered from decreasing margins more than many of the comparable companies. Its pretax margins went from 7.6 to 4.5 percent in 5 years, a 41-percent drop. Return on average common equity (ROE). While many of the comparable companies posted ROE's of over 15 percent during the 5-year period, Rand McNally went from 12.5, peaking at 15, and dropped to 9.8 from 1977 to 1981. This is somewhat less than the average for most of the comparable companies. In conclusion, we find that Rand McNally was slightly below average *301 relative to the comparable companies. While petitioners' experts concluded that Rand McNally was well-below average, there were several intangibles that we think would increase value that were not reflected in the accounting reports. The Encyclopedia Britannica contract (knowledge of which was available prior to decedents' deaths), sales from which would not commence until 1983, would have a positive effect on value. In addition, the management reorganization would also have some positive effect. While some experienced personnel would be lost, it would, at the least, result in reduced management costs. The Rand McNally name would also have a positive effect. The corporation had been in business for over 100 years. P/E ratios for the comparable companies ranged from approximately 4 to 15 on June 8, 1982, and 5 to 17 on September 21, 1982. Market/book ratios during the same period ranged from 36 percent to 676 percent. Another factor in the comparable company analysis is the latest 12-month earnings. Assuming reporting was done at quarterly intervals, the June 8 (Neff) valuation was based on March 31 trailing 12-month earnings, and the September 21 (Clow) valuation was based *302 on June 30 trailing 12-month earnings. Using trailing 12-month earnings, as petitioners' experts point out, is more accurate than using data from the last calendar or fiscal year. A $ 23 per share value for the Neff shares implies a 6.9 P/E ratio on trailing 12-month earnings of $ 3.34. The $ 23 figure also reflects a market to book value ratio of approximately 59 percent, and a current dividend yield of 5.4 percent, within the range for the comparable companies. A $ 22 value for the Clow shares implies an 8.2 P/E ratio on trailing 12-month earnings of $ 2.69. The $ 22 figure also reflects a market to book value ratio of approximately 54 percent, and a current dividend yield of 5.7 percent, within the range for the comparable companies. The price earnings ratios are appropriate in light of the relatively low market/book ratio (lower than all but three or four of the comparable companies), and the intangible factors, such as the Rand McNally name and Encyclopedia Britannica contract. In addition, the values correspond to P/E ratios of 6.3 to 6.0 on 5-year average earnings per share of $ 3.64. Discount for Lack of Marketability
*303 In the typical arm's-length transaction involving unlisted stock, there would be a significant discount reflecting the out-of-pocket expenses or other costs to prepare a security for public sale, or to compensate the buyer of an unmarketable security for its lack of liquidity. See Estate of Hall v. Commissioner,92 T.C. 312 (1989). When calculating fair market value using a comparable company analysis to compare listed with unlisted shares, a discount is given to reflect the lack of marketability of the unlisted shares. Estate of Gilford v. Commissioner,88 T.C. 38 (1987). The circumstances of this case, however, reflect that only a relatively small discount is appropriate. Rand McNally had a history of compensating its shareholders for the shares' lack of liquidity. It repurchased shares on numerous occasions prior to 1982 from both family and nonfamily members. It purchased a large block from Frederick McNally. More important, the 1982 repurchase offer involved approximately one-fifth of the then outstanding shares. These repurchases were all at prices above our finding of fair market value (if adjusted for inflation). Rand McNally had a self-avowed *304 interest in retaining its status as a closely-held corporation with a limited number of shareholders, and therefore would be willing to pay full or premium value. With respect to the 1982 repurchase, many of the Rand McNally shareholders expressed a desire to have liquidity for part or all of their investment, and the company was willing to accommodate them. Respondent's expert Evans did not utilize a discount for lack of liquidity in valuing the subject shares, reasoning that the company would purchase or redeem the shares at full or premium value. However, we are reluctant to conclude that the corporation would, in every instance, be considered the hypothetical willing buyer of decedents' particular shares. See Estate of Andrews v. Commissioner,79 T.C. 938 (1982); Propstra v. United States,680 F.2d 1248 (9th Cir. 1982); Estate of Bright v. United States,658 F.2d 999 (5th Cir. 1981); Minahan v. Commissioner,88 T.C. 492 (1987). On the other hand, though, the hypothetical willing buyer would certainly take into account the stock repurchases, at premium prices, in valuing the stock. In addition, Rand McNally *305 consistently paid an increasing dividend on its common stock, partially obviating the liquidity problem. Finally, we take into consideration the fact that although Rand McNally was willing, it would probably not be able to effect a repurchase as large as the 1982 repurchase, given the capital intensive nature of its business. We do not foresee any difficulty, however, in making continued smaller repurchases. Petitioners' expert Cerone used a figure of 30 percent for the discount for lack of liquidity. Petitioners' expert Pettit used a 10-percent discount figure, considering the past history of stock purchases by the company and others. Respondent's experts Lerner and Miller used a 20-percent discount for the Neff shares only. On this aspect, the evidence, and Pettit's analysis, support a discount for lack of liquidity of 10 percent. Therefore, we conclude that the value of the Neff shares at the date of decedent Neff's death was $ 21 per share. The value of the Clow shares at the date of decedent Clow's death was $ 20 per share. While this result inherently is not precise, *306 Messing v. Commissioner,48 T.C. 502 (1967), it is appropriate considering all the facts and the often divergent expert testimony in the record. To reflect the foregoing, Decisions will be entered under Rule 155.
Appendix A RAND McNALLY & COMPANY
CONSOLIDATED BALANCE SHEET
June 30, 1982
(In 000's)
ASSETS
Current Assets
Cash and equivalent
$  7,679
Accounts receivable, net
30,515
Future tax benefits
3,508
Inventories
11,383
Prepaid expenses
744
Total current assets
53,829
Property, Plant, and Equipment, at cost
Land
1,294
Buildings
10,196
Machinery and equipment
55,539
Leasehold improvements
6,577
73,606
Less accumulated depreciation and amortization
35,053
Net property, plant, and equipment
38,553
Other Assets
Royalty advances
227
Investments and other assets
2,525
Purchased copyrights and goodwill, net
656
Total other assets
3,408
Total Assets
$ 95,790
LIABILITIES AND STOCKHOLDERS' EQUITY
Current Liabilities
Current portion of long-term debt
$  1,099
Accounts payable
4,909
Accrued liabilities
12,954
Income taxes
1,635
Total current liabilities
20,597
Long-term debt
20,991
Deferred income taxes
3,657
Redeemable preferred stock
2,744
Common Stockholders' Equity
Common stock
15,776
Paid-in capital
107
Retained earnings
44,976
60,859
Less treasury stock, at cost
13,058
Total common stockholders' equity
47,801
Total Liabilities and Stockholders' Equity
$ 95,790
Working Capital
$ 33,232
Current Ratio
2.6
Book Value Per Common Share
$  40.95
*307 Source: Unaudited financial statements. Footnotes
1. The parties have stipulated that the venue for an appeal of this decision would be to the Court of Appeals for the Seventh Circuit. Sec. 7482(b)(2), I.R.C. 1986↩.
2. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended and in effect at the respective decedents' deaths.↩
3. Revenues less cost of goods sold divided by revenues. ↩
4. Revenues less cost of goods sold less operating expenses divided by revenues. ↩
5. Earnings before interest income or expense and taxes.↩
6. These figures were provided in petitioner's expert Cerone's report, except for income taxes. Because the report only included income taxes on operations, we had to estimate the favorable effect the donation of the Hammond, Indiana, plant would have on actual income taxes for the trailing 12-month periods.↩
7. The average is between the June 8 and September 21, 1982, valuation dates, or the June and September valuations in the table below. This average is also applicable to the dividend yield statistic in both tables. ↩
8. The most recent dividend per share divided by the current price per share.↩