BEAM, Circuit Judge,
dissenting.
Because I would reverse the Tax Court’s applications of I.R.C. § 2703’s property valuation rules and Treasury Regulation § 25.2512-1’s willing buyer/willing seller test, I respectfully dissent.
I. I.R.C. § 2703
I.R.C. § 2703(a)(2) provides that the value of any property shall be determined without regard to “any restriction on the right to sell or use such property.” As an exception to this general rule, § 2703(b) provides that a restriction is considered for property valuation purposes if it meets each of the following requirements:
(1) It is a bona fide business arrangement.
(2) It is not a device to transfer such property to members of the decedent’s family for less than full and adequate consideration in money or money’s worth.
(3) Its terms are comparable to similar arrangements entered into by persons in an arms’ length transaction.
The court majority halted its analysis after its discussion of § 2703(b)(1), holding that the Holman partnership restrictions were not bona fide business arrangements. I, however, would hold that the restrictions safely satisfy § 2703(b)(l)’s bona fide business arrangement test as well as the remaining tests in § 2703(b)(2) and (3).
A. Bona Fide Business Arrangement Test— § 2703(b)(1)
The Holman family limited partnership was created to maintain family control over family assets, coordinate investment management, protect family assets from future creditors and other third parties, and to educate the Holman children as to wealth management. See ante at 766. To aid in achieving these goals, the partnership agreement includes transfer restrictions and a right of first refusal (the “restrictions”). The agreement also grants the general partners, Thomas and Kim Holman, exclusive control over the partnership’s business, including the power to determine the investments and investment strategy of the partnership.
Despite conceding that the partnership agreement’s restrictions “aid in control of the transfer” of partnership interests, Holman v. Commissioner, 130 T.C. 170, 194, 2008 WL 2189089 (2008), the Tax Court concluded that the provisions did not satisfy § 2703(b)(l)’s “bona fide business arrangement” test. After reviewing case law and § 2703’s legislative history, the Tax Court reasoned that partnership restrictions aimed at maintaining family control over a partnership and its assets do not serve a “bona fide business purpose” where, as here, “the partnership carried on little activity other than holding shares of [publicly-traded stock].” Id. Moreover, the Tax Court concluded that § 2703(b)(l)’s legislative history did not list educating children or preventing children from dissipating family assets as legitimate business purposes. Id. at 195.
As a preliminary matter, I disagree with the court majority’s decision to review the Tax Court’s application of § 2703(b)(1) for clear error based on its conclusion that “[t]he ultimate question of whether there was a bona fide business arrangement is a question of fact.” Ante at 769. To be sure, the ultimate determination of whether restrictions are bona fide business arrangements is likely a question of fact. However, the fundamental question before us is whether the Tax Court employed the correct criteria, framework, or test to *777 make this factual determination. This is a question of law, subject to de novo review. Cf. Estate of Palmer v. Comm’r, 839 F.2d 420, 423 (8th Cir.1988) (while “the ultimate determination of fair market value is a finding of fact ... [t]he question of what criteria should be used to determine value is a question of law”); IHC Health Plans, Inc. v. Comm’r, 325 F.3d 1188, 1193 (10th Cir.2003) (“The appropriate legal standard for determining whether an organization operates for a ‘charitable’ purpose is a legal question, which we review de novo.”). Moreover, this question requires a review of the Tax Court’s interpretation of § 2703(b)(1), and we review the Tax Court’s statutory interpretations de novo. Scherbart v. Comm’r, 453 F.3d 987, 989 (8th Cir.2006). Thus, we are presented with at least a mixed question of law and fact, if not a pure question of law. Either way, our precedent requires de novo review. Blodgett v. Comm’r, 394 F.3d 1030, 1035 (8th Cir.2005).
While interpreting § 2703(b)(1), our ultimate goal is to “give effect to the Congressional intent behind the statute’s enactment.” Estate of Farnam v. Comm’r, 583 F.3d 581, 584 (8th Cir.2009). Where, as here, the statute’s language is ambiguous,[7] it is appropriate to examine legislative history to determine legislative intent. Id. In light of § 2703(b)(l)’s legislative history, the court’s interpretation and application of § 2703(b)(1) does not give effect to the statute’s legislative intent.
The court, like the Tax Court, essentially holds that “maintaining family control” is a legitimate business purpose for partnership restrictions only when the “control” being preserved is the right to manage an operating business or an actively-managed asset. See ante at 770. While the court narrowly reads Estate of Bischoff v. Commissioner, 69 T.C. 32, 39-41, 1977 WL 3667 (1977) to bolster its holding, congressional committees cited Bischoff to support much broader propositions. First, the Joint Committee on Taxation cited Bischoff for the proposition that maintaining family control is a legitimate business purpose for buy-sell agreements, “even when the ‘control’ being preserved is a right to receive income from investment assets.” Staff of Joint Comm, on Taxation, 101st Cong., 2d Sess., Federal Transfer Tax Consequences of Estate Freezes 14 (Comm. Print 1990). Furthermore, the parenthetical following the Committee’s Bischoff citation explains that “maintenance of control is [a] business purpose even if the interest being sold is a limited partnership interest in a holding company.” Id. at 14 n. 44. Finally, the Senate Finance Committee cited Bischoff for the proposition that “[continuation of family ownership” is a legitimate business purpose for buy-sell agreements “even when the ‘control’ being preserved is only the right to participate as a limited partner.” Explanatory Material Concerning Committee on Finance 1990 Reconciliation Submission Pursuant to House Concurrent Resolution 310, 136 Cong. Rec. 30,488, 30,-538 (1990) [hereinafter Finance Committee Report], Accordingly, I think the Holman partnership restrictions served the congressionally-recognized legitimate business purposes of maintaining family control over the right to participate as a limited partner and the right to receive income from the partnership’s investment assets.
Next, the court attempts to distinguish the value-fixing agreement in Estate of Amlie v. C.I.R., 91 T.C.M. (CCH) 1017, 2006 WL 995337 (2006), from the restrictions in the present case. In Amlie, the *778 Tax Court determined that a conservator’s value-fixing agreement qualified as a bona fide business arrangement, in part, because it aided in “planning for future liquidity needs” of the ward’s estate. Id. at *12. To support it’s holding, the Tax Court in Amlie cited to a portion of the Finance Committee Report that provides:
The committee believes that buy-sell agreements are common business planning arrangements and that buy-sell agreements generally are entered into for legitimate business reasons that are not related to transfer tax consequences. Buy-sell agreements are commonly used to control the transfer of ownership in a closely held business, to avoid expensive appraisals in determining purchase price, to prevent the transfer to an unrelated party, to provide a market for the equity interest, and to allow owners to plan for future liquidity needs in advance.
Finance Committee Report, 136 Cong. Rec. at 30,539 (emphasis added); Amlie, 2006 WL 995337, at *12 (citing the same); see also Holman, 130 T.C. at 193-94 (quoting the same). Notably, the Tax Court recognized planning for future liquidity needs as a legitimate business purpose for the agreement despite the fact that the ward’s stock “was not an actively managed business interest but merely an investment asset.”[8] Amlie, 2006 WL 995337, at *12.
The court asserts that Amlie is distinguishable from the present case because the Holman partnership restrictions were not created to provide for the future liquidity needs of the partnership. This is a distinction without merit. Here, the Tax Court conceded that the Holman partnership restrictions aided in controlling the transfer of partnership interests to third parties. The court majority’s attempt to distinguish the present case from Amlie ignores that the same portion of legislative history cited by the Tax Court in Amlie, and quoted by the Tax Court in the present case, recognizes that buy-sell agreements serve the legitimate business purpose of “preventing] the transfer to an unrelated party.” Finance Committee Report, 136 Cong. Rec. at 30,539. If the absence of an “actively managed business interest” was irrelevant in Amlie, it is unclear why an actively managed business interest is required in the present case to legitimize the Holman partnership restrictions.
In light of Amlie and § 2703(b)(l)’s legislative history, the Holman partnership restrictions serve the legitimate business purpose of protecting partnership assets from unrelated parties.[9] Protecting partnership assets from creditors is surely a *779 legitimate business purpose for transfer restrictions, regardless of whether the partnership manages an operating business or merely holds publicly-traded stock. Cf. Estate of Mundy v. Comm’r, 35 T.C.M. (CCH) 1778, 1976 Tax Ct. Memo LEXIS 8, at *46, 1976 WL 3573 (1976) (finding that insulating corporate assets from possible liabilities was a valid business purpose for restricting transferability of stock). Similarly, protecting partnership assets from the Holman daughters’ potential future ex-spouses is a legitimate business purpose for the restrictions. Cf. Keller v. United States, No. V-02-62, 2009 WL 2601611, at *19 (S.D.Tex. Aug. 20, 2009) (recognizing protecting family assets from depletion by ex-spouses through divorce proceedings as a “legitimate business purpose” for the creation and funding of a partnership).
Additionally, the Holman partnership restrictions serve the legitimate business purpose of preserving the partners’ fundamental right to choose who may become a partner.[10] See In re Schick, 235 B.R. 318, 324 (Bankr.S.D.N.Y.1999) (recognizing that, although arguably more important in the general partnership context, the right to choose partners “still provides the underlying rationale for restricting the admission of new or substitute limited partners”). As the Holmans’ partnership expert explained:
Partnership agreements contain [transfer] restrictions because persons who join together as partners generally desire a high degree of certainty as to who their partners are and will be, especially where they establish the entity with commonly-shared investment goals and the intention that the entity be closely-held. They want the ability to limit who may become their partner without their agreement that such person may take a place at the table.
Without restrictions on who may become a limited partner, Thomas and Kim Holman, as general partners, could find themselves owing obligations[11] and fiduciary duties to third parties to whom they never envisioned owing such obligations and duties— e.g., the Holman daughters’ future spouses. Such obligations and duties exist regardless of whether the Holman limited partnership operates a lemonade stand or holds Dell stock. And, as the Holmans’ partnership expert explained, “[h]aving an unwanted partner or assignee of a partnership interest is likely to increase the general partner’s risk of personal liability.” Finally, I think the court’s decision is contrary to the underlying purposes of § 2703. Section 2703 is one of several special valuation rules Congress enacted, in part, “to allow business owners who are not abusing the transfer tax system to freely engage in standard intrafamily transactions without being subject to severe transfer tax consequences.” Finance Committee Report, 136 Cong. Rec. at 30,-538. Congress enacted § 2703, in particular, to “distinguish between agreements designed to avoid estate taxes and those with legitimate business agreements.” Id. at 30,539. This legislative history suggests that the bona fide business arrangement test was designed to determine whether restrictions are created primarily to avoid transfer taxes.
*780 Here, the Tax Court made the express factual determination that the partnership agreement restrictions were “designed principally ” to protect family assets from dissipation by the Holman daughters. Holman, 130 T.C. at 195 (emphasis added). In other words, the Tax Court determined that the restrictions were designed primarily to serve a non-tax purpose. Notably, the Tax Court did not find that the Holmans merely paid lip service to legitimate business purposes for the restrictions while, in reality, using the restrictions for the primary purpose of avoiding taxes.[12] Additionally, the Tax Court did not find that the restrictions failed to match the partnership’s legitimate, non-tax goals.[13] The underlying purposes of § 2703 are not served where, as here, the bona fide business arrangement test is applied in a manner that discourages partners in family partnerships from creating restrictions principally to achieve non-tax, economic goals.
Thus, I would hold that the Holman partnership agreement restrictions are “bona fide business arrangements” because they were not created for the primary purpose of avoiding taxes, and they served the following legitimate business purposes: (1) maintaining family control over the right to participate as a limited partner; (2) maintaining family control over the right to receive income from the partnership’s investment assets; (3) protecting partnership assets from creditors and potential future ex-spouses; and (4) preserving the partners’ fundamental right to choose who may become a partner.
B. Device Test— § 2703(b)(2)
Having determined that the partnership restrictions satisfy § 2703(b)(1), I now turn to § 2703(b)(2)’s “device” test. Under this test, the Holman partnership restrictions must not be a “device to transfer such property to members of the decedent’s family for less than full and adequate consideration in money or money’s worth.” I.R.C. § 2703(b)(2) (emphasis added). Treasury Regulation § 25.2703 — 1(b)(1)(ii) excises the phrase “members of the decedent’s family” found in § 2703(b)(2) and substitutes in its place the phrase “natural objects of the transferor’s bounty,” apparently because the Secretary of the Treasury interprets § 2703(b)(2) to apply to both inter vivos transfers and transfers at death. Holman, 130 T.C. at 195-96. Applying this regulation, the Tax Court held that the Holman partnership restrictions operate as a device to transfer property to the natural objects of the Holmans’ bounty. The Holmans argue that Treasury Regulation § 25.2703 — l(b)(l)(ii) is invalid because it fails to give effect to § 2703(b)(2)’s plain language. I agree.
The validity of a treasury regulation is a question of law, which we review de novo. Walshire v. United States, 288 F.3d 342, 345 (8th Cir.2002). We afford treasury *781 regulations interpreting the Internal Revenue Code “substantial deference.” Mayo Found. for Med. Educ. & Research v. United States, 568 F.3d 675, 679 (8th Cir.2009). That said, our first question in reviewing an agency’s interpretation of a statute is “whether Congress has directly spoken to the precise question at issue.” Chevron, U.S.A., Inc. v. Natural Res. Def. Council Inc., 467 U.S. 837, 842, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). If so, we, “as well as the agency, must give effect to the unambiguously expressed intent of Congress.” Id. at 843, 104 S.Ct. 2778. If, however, “the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency’s answer is based on a permissible construction of the statute.” Id.
The parties primarily dispute whether § 2703(b)(2) is ambiguous. The Holmans assert that the term “decedent” unambiguously refers to a deceased person and, therefore, § 2703(b)(2) asks only whether restrictions operate as a device to transfer property to family members at death. The Holmans point out that only the term “decedent,” not the broader term “transferor,” is used throughout § 2703(b)(2)’s legislative history. Conversely, the Commissioner argues that the term “decedent” is ambiguous due to § 2703’s location in the Internal Revenue Code. Specifically, § 2703 is located in Subtitle B of the Code, which includes three transfer taxes — the estate, gift and generation-skipping transfer taxes. More precisely, § 2703 is located in Subtitle B, Chapter 14. In Chapter 14, § 2703 joins a set of special valuation rules targeting transfer tax avoidance schemes.
It is clear that the phrase “members of the decedent’s family” unambiguously limits § 2703(b)(2)’s application to transfers at death. First, the term “decedent” is itself unambiguous. Black’s Law Dictionary 465 (9th ed.2009) plainly defines “decedent” as “[a] dead person.” Moreover, the phrase “members of decedent’s family” is not ambiguous when read in the greater context of Chapter 14. While Congress used the term “decedent” in § 2703(b)(2), it used the broader term “transferor” in Chapter 14’s other valuation statutes. See I.R.C. §§ 2701(a)(1) & 2702(a)(1). And, as the Holmans point out, the term “decedent” consistently appears in § 2703(b)(2)’s legislative history. Finally, I find it telling that members of Congress have failed in their attempts to amend § 2703(b)(2) by substituting the legislative phrase “members of the decedent’s family” with the Commissioner’s phrase “natural objects of the transferor’s bounty.” See Smith v. United States, No. C.A. 02-264 ERIE, 2004 WL 1879212, at *6 n. 3 (W.D.Pa. June 30, 2004). Thus, although Congress enacted Chapter 14 to generally address transfer tax avoidance schemes, § 2703(b)(2) applies specifically to transfers at death.
Therefore, Treasury Regulation § 25.2703 — l(b)(l)(ii) is invalid because it does not give effect to the plain language of § 2703(b)(2). Since the Holmans are living persons, they are, by definition, not “decedents” and § 2703(b)(2)’s device test is satisfied.
C. Comparable Terms Test- § 2703(b)(3)
Since the Holman partnership restrictions satisfy § 2703(b)(1) and (2), I now analyze the restrictions under § 2703(b)(3). Under § 2703(b)(3)’s “comparable terms” test, the Holman partnership restrictions’ terms must be “comparable to similar arrangements entered into by persons in an arms’ length transaction.” While the Tax Court did not decide whether the restrictions satisfied the comparable terms test, it noted that both parties’ experts “agree that transfer restrictions comparable to *782 those found in [the Holman partnership agreement] are common in agreements entered into at arm’s length.”[14] Holman, 130 T.C. at 198-99. The Tax Court explained that this “would seem to be all that [the Holmans] need to show to satisfy section 2703(b)(3).” Id. at 199. I agree, and I would hold that the Holman partnership restrictions satisfy § 2703(b)(3)’s comparable terms test.
Thus, because the partnership restrictions satisfy all three of § 2703(b)’s tests, I would reverse and remand to the Tax Court for a valuation of the limited partnership interests that does not disregard the partnership restrictions.
II. MARKETABILITY DISCOUNT CALCULATION
As a preliminary matter, I also disagree with the court’s decision to review the Tax Court’s marketability discount calculation for clear error. “The mathematical computation of fair market value is an issue of fact, but determination of the appropriate valuation method is an issue of law that we review de novo.” Estate of Jelke v. Comm’r, 507 F.3d 1317, 1321 (11th Cir.2007) (quotation and alteration omitted); see also Palmer, 839 F.2d at 423 (the “question of what criteria should be used to determine value is a question of law subject to de novo review”). Since the real issue here is whether the Tax Court used a proper valuation method — i.e., properly applied the willing buyer/willing seller test to calculate an appropriate marketability discount, I would review this legal issue de novo.
Under Treasury Regulation § 25.2512-1, the value of property for gift tax purposes is “the price at which such property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell, and both having reasonable knowledge of relevant facts.” While the hypothetical willing seller and willing buyer “are presumed to be dedicated to achieving the maximum economic advantage,” Estate of Newhouse v. Commissioner, 94 T.C. 193, 218, 1990 WL 17251 (1990), “the Commissioner cannot tailor ‘hypothetical’ so that the willing seller and willing buyer [are] seen as the particular persons who would most likely undertake the transaction.” Morrissey v. Comm’r, 243 F.3d 1145, 1148 (9th Cir.2001) (internal quotation omitted).
While assessing the partnership interests’ marketability for valuation purposes, the Tax Court conceded that the private market for such interests was “thin.” Holman, 130 T.C. at 214. However, the Tax Court adopted the opinion of the Commissioner’s expert that this “thin” market did not justify a substantial marketability discount because the wishing-to-assign partner could convince the remaining partners to voluntarily dissolve the partnership and buy him out. Specifically, the Tax Court reasoned:
[G]iven the significant minority interest and marketability discounts from an LP unit’s proportional share of the partnership’s [net asset value] that each expert would apply in valuing the gifts, it would appear to be in the economic interest of both any limited partner not under the economic necessity to do so but wishing to make an impermissible assignment of LP units and the remaining partners to strike a deal at some price between the discounted value of the units and the dollar value of the units’ proportional share of the partnership’s [net asset val *783 ue]. The wishing-to-assign partner would get more than she would get in the admittedly “thin” market for private transactions, and the dollar value of each remaining partner’s share of the partnership’s [net asset value] would increase.
Id. at 214.
The Tax Court’s analysis violates the hypothetical willing buyer/willing seller test because it assumes the hypothetical buyers own Holman limited partnership interests. See Estate of Jung v. Comm’r, 101 T.C. 412, 438, 1993 WL 460544 (1993). The court majority asserts that the Tax Court properly cast the hypothetical willing buyer “merely as a rational economic actor,” but the Tax Court did more than that. Ante at 775 (emphasis added). The Tax Court effectively plucked rational economic actors out of the existing “thin” private market,[15] placed Holman limited partnership shares in their pockets, and asked them what they would pay for a wishing-to-assign partner’s interest in light of the partnership’s dissolution provisions. In fact, the Tax Court’s analysis is essentially based on the idea that a mere rational economic actor in the existing market would pay less than rational actors who already hold Holman limited partnership interests.[16] Courts commit legal error where, as here, they substitute hypothetical buyers for “particular possible purchasers” based on “imaginary scenarios as to who a purchaser might be.” Estate of Simplot v. Comm’r, 249 F.3d 1191, 1195 (9th Cir.2001).
That is not to say that courts err whenever they consider partnership agreements’ dissolution provisions while calculating an appropriate marketability discount. For example, if the Holman limited partnership had a significant history of dissolving and buying out wishing-to-assign partners, a hypothetical willing buyer would consider this fact while assessing the partnership interests’ marketability. See, e.g., Estate of Neff v. Comm’r, 57 T.C.M. (CCH) 669, 1989 Tax Ct. Memo LEXIS 278, at *27, 1989 WL 59828 (1989) (determining that “the hypothetical willing buyer would certainly take into account the [corporation’s history of] stock repurchases, at premium prices, in valuing the stock”). Indeed, hypothetical willing buyers and willing sellers are considered to have “reasonable knowledge of relevant facts” surrounding the hypothetical sale. Treas. Reg. § 25.2512-1.
Here, the Commissioner’s expert never determined the actual likelihood of the Holman limited partnership executing a dissolution and buy-out scheme. Holman, 130 T.C. at 214. The expert merely opined that he could not “envision an economic reason why” the partnership would not engage in such a scheme. Id. (quotation omitted). This analysis is not helpful because it does not consider the fact that the Holman limited partnership has never engaged in such a scheme, see Jung, 101 T.C. at 437 n. 9, or whether the Holman limited partnership or limited partnership owners do or do not have sufficient liquidity to buy out a wishing-to-assign partner. The expert’s analysis also does not consider that *784 dissolving and buying out a wishing-to-assign partner may be contrary to the partnership’s stated goals — maintaining control of family assets, continuing ownership of family assets, and restricting the ability of unrelated parties to acquire interests in family assets. Against this factual backdrop, the hypothetical willing buyer may find that the actual probability of the remaining partners unanimously consenting to a dissolution and buy-out scheme is quite low.
Thus, the Tax Court’s misapplication of the willing buyer/willing seller test constitutes reversible error. Accordingly, I would also reverse and remand to the Tax Court for a new marketability discount determination.
For the foregoing reasons, I respectfully dissent.

. The Tax Court noted that § 2703 "contains no definition of the phrase 'bona fide business arrangement,’ ” Holman, 130 T.C. at 192, and acknowledged that "[t]he meaning of the term 'bona fide business arrangement’ ... is not self apparent,” id. at 195. I agree.

. In Amlie, the Commissioner argued that the agreement could not satisfy § 2703(b)(1) unless the stock was an actively managed business interest. The Tax Court explained: "We rejected such an argument in Estate of Bischoff v. Commissioner, 69 T.C. 32, 40-41, 1977 WL 3667 (1977), and find it equally unpersuasive here." Amlie, 2006 WL 995337, at *12.

. The Tax Court acknowledged that the Holman partnership agreement restrictions were intended, in part, to place “strong limitations on what the limited partners can do in assigning or giving away their interests to other people” and to provide a " ‘safety net' if an impermissible person obtained an assignment of a limited partner interest from one of the girls.” Holman, 130 T.C. at 194 (quotation omitted). Indeed, the partnership agreement provides that the Holman partnership was created to "restrict the right of non-Family persons to acquire interests in Family Assets” and to "provide protection to Family Assets from claims of future creditors against Family members.” Id. at 176. Moreover, at trial, Thomas Holman testified: "[W]e were worried that the assets that the girls would eventually come into would be sought after by third-party people, friends, spouses, potential creditors.”

. At trial, Thomas Holman explained that the partnership allowed the Holmans "to give [their] daughters a seat at the table, to become real partners in the operation of [the] business.” Moreover, one of Thomas Holman's long-term goals was to have his daughters "become more and more engaged in the partnership over time.”

. For example, section 6.1 of the Holman partnership agreement provides: "The General Partners shall use their best efforts to carry out the purposes and business of the Partnership in a prudent and businesslike manner.”

. While the Tax Court determined that Thomas Holman understood the tax benefits of creating a partnership, it did not determine that tax avoidance was the principal purpose of the partnership restrictions. Indeed, understanding tax benefits and using transfer restrictions for the primary purpose of avoiding taxes are two different things.

. The court majority states that restrictions on the sale or use of property, "[w]hen carefully crafted and applied in certain circumstances ... can minimize the tax consequences of gifts or transfers without imposing substantial additional limitations on the transferability or use of the property.” Ante at 768. Here, however, there is apparently no question that the Holman partnership restrictions imposed actual, substantial limitations on the transfer of partnership interests. Indeed, even the Commissioner's expert recognized that "[i]n virtually every material respect” the Holman partnership agreement "blocks for 50 years the limited partners’ ability to sell or use their respective limited partner interests.” Holman, 130 T.C. at 197.

. The court in footnote 5 appears to import language from one of the Commissioner's experts to impeach the Tax Court's statements concerning the requirements of § 2703(b)(3). At best, the cited emanations of this particular witness are barely relevant to a proper interpretation of this portion of the statute.

. A rational actor "seeks to maximize his advantage in the context of the market that exists at the date of valuation.” Estate of Jameson v. Comm’r, 267 F.3d 366, 370 (5th Cir.2001) (emphasis added).

. The Tax Court reasoned that the remaining partners and the wishing-to-assign partner could "strike a deal at some price between the discounted value of the units and the dollar value of the unit’s proportional share of the partnership’s [net asset value]” and, as a result, ”[t]he wishing-to-assign partner would get more than she would get in the admittedly ‘thin’ market for private transactions.” Holman, 130 T.C. at 214 (emphasis added).